JOURNAL ENTRY AND OPINION *Page 3 
{¶ 1} Defendant, Roger Neff (appellant), appeals his convictions of engaging in a pattern of corrupt activity, possession of criminal tools, and theft. After reviewing the facts of the case and pertinent law, we affirm.
 I {¶ 2} All charges in the instant case stemmed from an ongoing retail refund scheme involving three defendants — Joan Hall (Joan), her daughter, Lisa Hall (Lisa), and Joan's live-in boyfriend, appellant. The scheme involved Joan returning merchandise in various fraudulent ways to local retailers as well as stores in other states, over at least a 15-year period.
 {¶ 3} Appellant was convicted in this case under a complicity theory, specifically that he aided and abetted Joan in committing the offenses. Although the total amount of theft perpetrated by the three defendants is unclear, it was in excess of $1 million. Due to the extended time frame in which the offenses occurred, as well as the overwhelming amount of evidence, including credit cards, gift cards, retail store credit slips, financial statements, receipts, blank merchandise tickets and tags, and tools of the trade used in the retail industry, such as plastic tag fastener guns, the facts of this case will be discussed as they relate to appellant in his assignments of error, infra. A more detailed substantive history may be found in the companion cases ofState v. Joan Hall, Cuyahoga App. No. 90366 and State v. Lisa Hall, *Page 4 
Cuyahoga App. No. 90365. However, the procedural history of the instant case is as follows.
 {¶ 4} On January 10, 2006, appellant was indicted for one count of engaging in a pattern of corrupt activity in violation of R.C. 2923.32(A)(1); two counts of tampering with records in violation of R.C. 2913.42; one count of possession of criminal tools in violation of R.C. 2923.24; and one count of theft in violation of R.C. 2913.02. On March 15, 2007, the case was tried to the court. On May 8, 2007, the court found appellant guilty of engaging in a pattern of corrupt activity, possession of criminal tools, and theft. On June 8, 2007, the court sentenced appellant to an aggregate term of three years in prison[1]
 II {¶ 5} In his first assignment of error, appellant argues that "the evidence at trial was insufficient to sustain a conviction for engaging in a pattern of corrupt activity in violation of R.C. 2923.32(A)(1), possession of criminal tools in violation of R.C. 2923.24 and theft in violation of R.C. 2913.02." Specifically, appellant argues that while he may have known about Joan's criminal activities, and he "may have made a few returns," there was no evidence that he was an accomplice to the crimes.
 {¶ 6} When reviewing sufficiency of the evidence, an appellate court must determine "[w]hether, after viewing the evidence in a light most favorable to the *Page 5 
prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v.Jenks (1991), 61 Ohio St.3d 259.
 {¶ 7} In the instant case, appellant was convicted of the following offenses:
 {¶ 8} R.C. 2923.32 Engaging in pattern of corrupt activity — "(A)(1) No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity
 {¶ 9} R.C. 2923.24 Possessing criminal tools — "(A) No person shall possess or have under the person's control any substance, device, instrument, or article, with purpose to use it criminally."
 {¶ 10} R.C. 2913.02 Theft — "(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services *** (3) By deception ***."
 {¶ 11} Furthermore, appellant was convicted of the above offenses as an accomplice, which is defined in R.C. 2923.03: "(A) No person, acting with the kind of culpability required for the commission of an offense, shall *** (2) Aid or abet another in committing the offense ***." Ohio courts have held the following regarding aiding and abetting:
 "In order to support a conviction for complicity by aiding and abetting under R.C. 2923.03, `the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal.' State v. Johnson, 93 Ohio St.3d 240, 2001-Ohio-1336, 754 N.E.2d 796, syllabus. Such evidence may be inferred from presence, companionship and conduct before and *Page 6 
after an offense is committed. State v. Cartellone (1981), 3 Ohio App.3d 145, 150, 3 Ohio B. 163, 444 N.E.2d 68. Further, `aiding and abetting may also be established by overt acts of assistance such as driving a getaway car or serving as a lookout.' Id. See, also, State v. Trocodaro (1973), 36 Ohio App.2d 1, 6, 301 N.E.2d 898."
State v. Jackson, Franklin App. No. 03AP-273, 2003-Ohio-5946, at ¶ 32. See, also, State v. Hedrick (Feb. 18, 1988), Cuyahoga App. No. 53422 (holding that "the requisite culpability necessary to sustain the conviction of an aider and abettor under R.C. 2923.03 will be presumed where the crime committed by a principal in furtherance of a common design to commit a criminal offense reasonably could have been contemplated by the aider and abettor as a natural and probable consequence of the commission of that criminal offense").
 {¶ 12} Additionally, the Ohio Revised Code defines "corrupt activity" as "engaging in, attempting to engage in, conspiring to engage in, or soliciting, coercing, or intimidating another person to engage in ***," a theft offense, among other violations. R.C. 2923.31(I). A "pattern of corrupt activity" is defined as "two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event." R.C. 2923.31(E).
 {¶ 13} In the instant case, the state presented the following evidence against appellant:
 {¶ 14} Vicky Borowski, who has been employed with various TJ Maxx stores throughout Ohio since 1994, testified that she saw appellant approximately four to *Page 7 
five times when he came into TJ Maxx stores attempting to fraudulently return merchandise with Joan. For example, Borowski gave the following testimony:
 "There was a gentleman that would come in shortly after [Joan] would enter the building. They would not interact with each other while they were in the store; however, they would leave in the same car.
 "***
 "Um, there was a used rug that he was returning. It had already been used. It was rolled up.
 "Q: Okay. And tell us what happened? Was there a price tag on it?
A: There was a price tag attached from that rug, from TJ Maxx.
Q: Was the rug TJ Maxx merchandise?
A: No, it was not.
Q: And was the price tag a TJ Maxx price tag?
A: Yes, it was.
Q: Okay. You say it was clearly used. How did you know it was used?
A: When you opened it, there were — it was dirt. There were stains. You could tell it was not sold to someone in that condition, that it had been used.
Q: Okay. And did you have a conversation with this individual?
A: I did.
Q: And could you tell us what that conversation was?
A: I approached the service desk, and looking at the rug. I denied the return of the rug.
Q: Okay. Did you know — were you able to identify who that individual was from that interaction?
 A: Yes. *Page 8 
Q: How were you able to identify that person?
A: By merchandise credit slip.
Q: And what was the name on the merchandise credit slip?
A: Roger Neff."
 {¶ 15} Borowski then made an in-court identification of appellant as the man she dealt with in that transaction.
 {¶ 16} Donna Bierman, who has been in management positions at several TJ Maxx stores on the west side of Cleveland, testified that between 1997 and 2002, she refused many return items from appellant. Specifically, she recalled one example where he attempted to purchase a $299 rug with a $39.99 credit voucher, but she gave him the voucher back and had him leave the store without the rug.
 {¶ 17} Cindy Sullivan, who manages a TJ Maxx store in Ypsilanti, Michigan, testified that she remembered at least three questionable transactions involving appellant. First, in November or December of 1999, he returned a rug for over $300, which should have been approved by a manager, but somehow was not. She recognized the name of R.J. Neff on the merchandise credit form as a name she had seen on the store's daily communication log. The next day, she observed appellant and Joan attempting to return "merchandise that didn't match up with the tickets." Sullivan testified that she took some of the merchandise back so she could pass the names and contact information on to TJ Maxx's loss prevention department, but that she refused to take back all of the items.
 {¶ 18} The next time Sullivan remembered seeing appellant was in 2004, when he again came into the store with Joan. They were attempting to return another rug, *Page 9 
and they told the TJ Maxx employee that the store manager said they could return the rug for cash because they lost their receipt. Sullivan told them she did not give permission to return the rug for cash and refused the return. Appellant and Joan then left the store.
 {¶ 19} Ben Gee, who was manager of the TJ Maxx in Fairlawn, Ohio, testified that sometime in 2000, appellant attempted to return a woman's coat to his store.
 "I proceeded to go up, and I actually looked at him and said, Mr. Neff, and he acknowledged by shaking his head. Looked at the merchandise. It was not our merchandise. It was used. It was what I would call a piece of junk. And, it had a TJ Maxx ticket for a more expensive lady's coat on it.
 ***
 "I explained to Mr. Neff that it was not our merchandise, and I was not going to take it back. He left without incident."
 {¶ 20} Gee then identified appellant as Mr. Neff.
 {¶ 21} A thorough review of the record shows that at least five additional individuals who work in the retail industry and one individual who works in the banking industry testified to similar experiences with appellant. This testimony, coupled with evidence that appellant lived with Joan in the house where police recovered massive amounts of merchandise, boxes of blank price tags, ticketing guns and plastic fasteners, various credit cards, and over $50,000 in cash, shows that there was more than enough evidence to prove the essential elements of the offenses with which appellant was charged.
 {¶ 22} Accordingly, appellant's first assignment of error is overruled. *Page 10 
 III {¶ 23} In his second assignment of error, appellant argues that "the verdict finding the appellant guilty of engaging in a pattern of corrupt activity in violation of R.C. 2923.32(A)(1), possession of criminal tools in violation of R.C. 2923.24 and theft in violation of R.C. 2913.02 was against the manifest weight of the evidence."
 {¶ 24} The proper test for an appellate court reviewing a manifest weight of the
evidence claim is as follows:
 "The appellate court sits as the `thirteenth juror' and, reviewing the entire record, weighs all the reasonable inferences, considers the credibility of witnesses and determines whether, in resolving conflicts in evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."
State v. Thompkins (1997), 78 Ohio St.3d 380, 387.
 {¶ 25} In State v. Dowell, Cuyahoga App. No. 83575, 2004-Ohio-3870, we held the following: "While the test for sufficiency requires a determination of whether the State has met its burden of production at trial, a manifest weight challenge questions whether the State has met its burden of persuasion."
 {¶ 26} In the instant case, appellant argues that the court erred in finding him guilty because, although he "had a love relationship with Joan Hall, *** lived in her home *** [and] may have been aware that Joan Hall was committing the crimes *** he in no way furthered her actions." Appellant additionally argues that he was under no obligation to report Joan's illegal activities. However, a review of the record shows that the state's evidence against appellant was uncontradicted. Furthermore, the *Page 11 
evidence was consistent, credible, and certain regarding the various fraudulent or deceptive retail transactions that appellant engaged in with Joan. See our analysis of appellant's first assignment of error, supra.
 {¶ 27} Accordingly, we hold that the court did not act contrary to the manifest weight of the evidence in convicting appellant of engaging in a pattern of corrupt activity, possessing criminal tools, and theft. Appellant's second assignment of error is overruled.
 IV {¶ 28} In appellant's third assignment of error, he argues that "the trial court committed reversible error when it failed to dismiss all counts against the appellant where the state violated discovery rules pursuant to both Brady v. Maryland and Ohio Rule of Criminal Procedure 16."
 {¶ 29} We first note that the standard of review for admissibility of evidence is abuse of discretion. See Peters v. Ohio State LotteryComm. (1992), 63 Ohio St.3d 296. In State v. LaMar, 95 Ohio St.3d 181,187, 2002-Ohio-2128, the Ohio Supreme Court held the following regarding suppression of documents:
 "Suppression by the prosecution of evidence that is favorable to the accused and `material either to guilt or to punishment' is a violation of due process. Evidence suppressed by the prosecution is `material' within the meaning of Brady [v. Maryland (1963), 373 U.S. 83] only if there exists a `reasonable probability' that the result of the trial would have been different had the evidence been disclosed to the defense. As the United States Supreme Court has stressed, `the adjective ["reasonable"] is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood *Page 12 
as a trial resulting in a verdict worthy of confidence.'" (Internal citations omitted.)
See, also, Crim. R. 16(B). Additionally, Crim. R. 16(D) states that the parties have a continuing duty to disclose "additional matter which would have been subject to discovery" in a prompt manner.
 {¶ 30} In the instant case, appellant argues that the state produced "thousands" of new documents during trial. This is simply untrue. A review of the record shows that of the thousands of documents that were considered in this case, the majority of them were disclosed to the three defendants in a timely fashion. Approximately 200 documents were produced by the state during trial. Appellant does not identify any of them specifically; rather, he makes a blanket assertion that regardless of what the documents were, they were provided to him with no time to prepare, and, as a result, he was denied a fair trial.
 {¶ 31} However, appellant fails to address a key element in this type of discovery violation — whether the information was material, or in other words, whether there was a reasonable probability that the result of the trial would have been different had the information been disclosed to him earlier. In combing through over 5,000 pages of transcripts, we find no instances where the state suppressed material evidence.
 {¶ 32} For example, well before trial started, the state provided the defendants with statements of credit cards held by the defendants that were to be used in trial. Additionally, the state submitted binders and PowerPoint presentations as exhibits *Page 13 
that contained compilations of these credit card statements. Subsequently, during the early stages of trial, the state introduced as exhibits revised binders that compiled the credit card statement information in a new manner. Specifically, the state explained the revision to exhibit 13, for example, as follows:
 {¶ 33} "This document, again, is a PowerPoint that was given to them, I believe in January, Judge. The reason why there's [sic] more pages was that we separated-there [were] two slides on one page. We separated them." The court asked the state if the binder contained the same information and the state replied that it did, with the exception that it deleted the conclusion sections and some information that it deemed hearsay. The state stressed that no "new" evidence was added. The defendants objected to this exhibit.
 {¶ 34} Another specific example is that, before trial, the state turned over a Huntington Bank credit card number to the defendants to be used as evidence of the offenses. However, the state did not get the account statement until mid-trial, at which time the defendants objected to its admission. The credit card belonged to one of the defendants, and its existence was established at trial. Thus, this account information was available to the defendants at any time.
 {¶ 35} A third example comes in the form of a receipt for an item purchased at a Marshalls store, which was mentioned during trial but was not physically handed over to the defendants before trial. During discovery, the state disclosed defendants' credit card statements, compilation charts of those statements, and a witness list of *Page 14 
who was to testify about the transactions noted in the statements. Once again, the defendants objected to mentioning the receipt at trial.
 {¶ 36} In response to the defendants' objections, the court gave the defense counsel additional time to review the documents. We conclude that the documents were neither exculpatory nor material in nature, as they were cumulative and did not introduce any new evidence at trial. The outcome of the trial would not have been different, for example, if a receipt for a fraudulently returned item was kept out of trial because the store clerk who conducted the transaction testified to the incident. Thus, appellant fails to show that he did not receive a fair trial. In addition, in State v. Hughes (Nov. 4, 1993), Cuyahoga App. No. 62884, we held that "Brady does not require the government to disclose evidence available to the defense from other sources [and] *** Brady does not require the government to disclose information which is already in the possession of the defendant."
 {¶ 37} Given this, the court did not abuse its discretion when it allowed cumulative documents and nonexculpatory evidence into trial, and appellant's third assignment of error is overruled.
 V {¶ 38} In appellant's fourth and final assignment of error, he argues that "the trial court erred when it allowed the state to present `other acts' evidence in its [casein-chief] which was unfairly prejudicial to the appellant and had no probative value."
 {¶ 39} Evid. R. 404(B) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in *Page 15 
conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." In State v.Lowe (1994), 69 Ohio St.3d 527, 531, the Ohio Supreme Court held that there are two situations in which other acts evidence of identity is admissible at trial:
 "First are those situations where other acts `form part of the immediate background of the alleged act which forms the foundation of the crime charged in the indictment,' and which are `inextricably related to the alleged criminal act.' State v. Curry (1975), 43 Ohio St.2d 66, 73, 72 O.O.2d 37, 41, 330 N.E.2d 720, 725.
 ***
 "Other acts may also prove identity by establishing a modus operandi applicable to the crime with which a defendant is charged. `Other acts forming a unique, identifiable plan of criminal activity are admissible to establish identity under Evid. R. 404(B).' State v. Jamison (1990), 49 Ohio St.3d 182, 552 N.E.2d 180, syllabus. "`Other acts" may be introduced to establish the identity of a perpetrator by showing that he has committed similar crimes and that a distinct, identifiable scheme, plan, or system was used in the commission of the charged offense.' State v. Smith (1990), 49 Ohio St.3d 137, 141, 551 N.E.2d 190, 194.
 ***
 "A certain modus operandi is admissible not because it labels a defendant as a criminal, but because it provides a behavioral fingerprint which, when compared to the behavioral fingerprints associated with the crime in question, can be used to identify the defendant as the perpetrator. Other-acts evidence is admissible to prove identity through the characteristics of acts rather than through a person's character. To be admissible to prove identity through a certain modus operandi, other-acts evidence must be related to and share common features with the crime in question."
See, also, R.C. 2945.59 (stating that "[i]n any criminal case in which the defendant's motive or intent, *** scheme, plan, or system of doing an act is material, any acts of the defendant which tend to show [this] *** may be proved, whether they are contemporaneous with or prior or *Page 16 
subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant").
 {¶ 40} As stated earlier, we review the admissibility of evidence for an abuse of discretion. In the instant case, appellant specifically argues that "the state introduced numerous witnesses who spoke of incidents of Joan Hall's illegal return practices." Appellant does not cite to the record regarding any examples of the other acts testimony; rather, he makes a blanket assertion that "the admission of these other acts was unfairly prejudicial" to him.
 {¶ 41} A review of the record shows that Joan was engaged in this retail fraud scheme for at least 15 years and that she had various methods of attempting these acts, including buying merchandise at a low price and returning it at a higher price; returning used or inferior merchandise; returning items picked up off the shelf; switching merchandise price tickets; and fabricating credit card receipts. Additionally, she had certain stores that she frequently targeted, such as TJ Maxx and Marshalls. Without more specific information from appellant as to which acts prejudiced him and why, we conclude that the court did not abuse its discretion by admitting Joan's other acts to prove identity by modus operandi. Appellant's final assignment of error is overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant costs herein taxed.
 The court finds there were reasonable grounds for this appeal. *Page 17 
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
COLLEEN CONWAY COONEY, A.J., and JAMES J. SWEENEY, J., CONCUR.
[1] Co-defendant Joan Hall was found guilty of 74 counts of theft related offenses and sentenced to seven years in prison. Co-defendant Lisa Hall was found guilty of three counts of theft related offenses and sentenced to three years in prison. *Page 1